UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KEITH G. SMITH,

                         Petitioner,

    v.

ROBERT LeGRAND, *et al.*,

                         Respondents.

Case No. 3:14-cv-00029-MMD-CLB

ORDER

## I.    SUMMARY

Petitioner Keith G. Smith filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. This matter is before the Court for adjudication of the merits of the remaining grounds of the petition. For the reasons discussed below, the Court denies the petition, denies a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

## II.    BACKGROUND

Smith's convictions are the result of events that occurred in Clark County, Nevada on September 3, 2001. (ECF No. 16-6.) Sonia Solorzano visited Las Vegas, Nevada with two friends for Labor Day weekend 2001 and stayed at the Luxor Hotel and Casino. (ECF No. 16-18 at 6–7, 9.) On Sunday, September 2, 2001, Solorzano and her friends had dinner, walked around, and gambled at the Mandalay Bay Resort and Casino; took a cab to the Rio Hotel and Casino around midnight; and then took a cab to the Hard Rock Hotel and Casino a few hours later. (*Id.* at 16–17, 19.) Solorzano drank alcohol throughout the night. (*Id.* at 21.) One of Solorzano's friends left the Hard Rock Hotel and Casino at approximately 5:30 a.m. and went back to their hotel room. (*Id.* at 23.) Thereafter, Solorzano met a man named Jeff at a bar in the Hard Rock Hotel and

Casino, and, after believing her second friend had left to go back to their hotel room as well, shared a cab with Jeff sometime between 9:00 a.m. and 10:00 a.m. on Monday, September 3, 2001. (*Id.* at 25, 31, 33.)

The cab dropped Jeff off, and the next thing Solorzano remembered was "waking up in a room" wearing just her blouse "with [her] left arm dangling from what appeared to be something hooked to the ceiling." (*Id.* at 34–35.) There was a man, who Solorzano identified as Smith, in the room who eventually untied her arm, and Solorzano got dressed. (*Id.* at 36–38.) Solorzano felt lubrication in her vagina and felt that something had been inserted into her vagina. (*Id.* at 39-40.) After leaving the dark room, Solorzano saw a cab parked in front of the residence and realized that Smith must have been her cab driver. (*Id.* at 41–42.) Smith drove Solorzano to the Luxor Hotel and Casino. (*Id.* at 43.) When she got out of the cab, Solorzano told Smith, "'I know what you did. I know what you did to me, and I'm going to tell the cops.'" (*Id.* at 47.) Solorzano got the cab's license plate number and notified security. (*Id.* at 49.)

Smith was charged with first-degree kidnapping and sexual assault. (ECF No. 16-6 at 2–3.) Following a jury trial, Smith was found guilty of both charges on August 8, 2003. (ECF No. 16-22.) Smith was sentenced to life with the possibility of parole after five years for the first-degree kidnapping conviction and life with the possibility of parole after ten years for the sexual assault conviction. (ECF No. 16-25.) Smith's sentences were ordered to run consecutively. (*Id.*) Smith appealed, and the Nevada Supreme Court affirmed.[1] (ECF No. 17-1.) Remittitur issued on January 17, 2006. (ECF No. 17-2.)

Smith filed a state habeas petition on November 29, 2006. (ECF No. 17-8.) Following an evidentiary hearing, the state district court denied the petition on October 16, 2007. (ECF No. 17-14.) Smith appealed, and the Nevada Supreme Court reversed and remanded the case for the state district court to appoint counsel to assist Smith in

---

[1]The Nevada Supreme Court issued a limited remand to correct the judgment of conviction because it "incorrectly state[d] that Smith was convicted pursuant to a guilty plea." (ECF No. 17-1 at 8.)

his post-conviction proceedings. (ECF No. 17-20.) Smith was appointed counsel and filed a counseled, supplemental brief in support of his original state habeas petition. (ECF No. 17-25.) The state district court again denied Smith's petition on January 6, 2012. (ECF No. 17-34.) Smith appealed, and the Nevada Supreme Court affirmed. (ECF No. 17-39.) Remittitur issued on October 18, 2013. (ECF No. 18.)

Smith filed his federal habeas petition on July 3, 2014. (ECF No. 4.) Smith later filed a counseled, amended petition on April 27, 2015. (ECF No. 15.) Respondents moved to dismiss the amended petition on October 14, 2016. (ECF No. 29.) This Court granted the motion in part. (ECF No. 50.) Specifically, this Court dismissed Ground 6(a) as untimely and determined that Ground 7, Ground 8, and a portion of Ground 6(e) were unexhausted. (*Id.* at 9.) Smith moved for the partial dismissal of Ground 7, Ground 8, and the portion of Ground 6(e) that this Court previously determined were unexhausted. (ECF No. 51.) This Court granted the motion. (ECF No. 53.) Respondents answered the grounds remaining in Smith's amended Petition on February 5, 2018. (ECF No. 61.) Smith replied on August 10, 2018. (ECF No. 68.)

In his remaining grounds for relief, Smith asserts the following violations of his federal constitutional rights:

1. The state district court allowed a police officer to testify about his recorded statements without allowing Smith to present the actual record of those statements to the jury.
2. The state district court improperly allowed a witness to describe the complaining witness as a "typical rape victim."
3. The State committed multiple instances of misconduct during closing argument.
4. The State committed misconduct by failing to further test a blood sample for methamphetamine and then by arguing facts not in evidence.
5. He was denied the right to testify in his own defense.
6(b). His trial counsel failed to have him testify in his own defense, failed to consult with him regarding his right to testify, and failed to secure a waiver of that right.
6(c). His trial counsel failed to seek testing of the blood sample.
6(d). His trial counsel failed to obtain the victim's criminal record.
6(e). His trial counsel failed to make contemporaneous objections to two of the State's improper closing comments.

3

6(f). His trial counsel failed to object to the introduction of prejudicial evidence.

 (ECF No. 15 at 11–35.)

## III. LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be

///

objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

Smith's amended petition asserts ten remaining grounds for relief. The Court will address each ground in turn.

### A.    Ground 1

In Ground 1, Smith asserts that his Fifth Amendment due process right to a fair trial and his Sixth Amendment right to present a defense were violated when the state district court allowed Detective Hendrix to testify about Smith's recorded police interview statements without allowing Smith to present the actual record of those statements—either the tape recordings or the transcripts—to the jury. (ECF No. 15 at 11.) Smith contends that Detective Hendrix's testimony regarding his statement was inaccurate, selective, and misleading. (*Id.* at 18.) Smith also argues that the exclusion of the recordings and transcripts violated his Fifth Amendment right not to testify, or at least, improperly forced him to choose between his right to testify and his right to have a fair trial and present a complete defense. (*Id.* at 20.)

In his appeal of his judgment of conviction, Smith argued that the state district court violated his right to a fair trial and to due process when it failed to play the tape

recordings of his police interview. (ECF No. 16-29 at 25.) This claim contained several subparts, including an argument that the exclusion of this evidence violated his right to present a defense, an argument that the exclusion of this evidence violated his right not to be compelled to testify, and the argument that the evidence was inadmissible under Nevada law. (*Id.* at 29, 38.). Regarding the admissibility of the evidence under Nevada law, the Nevada Supreme Court held:

> Smith asserts that the district court erred in preventing him from admitting the audiotaped and transcribed forms of statements Smith made to Detective Hendrix regarding the incident. Specifically, Smith argues that NRS 47.120(1) required admission of his statements in both forms. Smith also argues that the tapes and transcript constitute the "best evidence" of his statements.
>
> This court reviews decisions to admit or exclude evidence for an abuse of discretion. NRS 47.120(1) provides the following:
>
>> When any part of a writing or recorded statement is introduced by a party, he may be required at that time to introduce any other part of it which is relevant to the part introduced, and any party may introduce any other relevant parts.
>
> In *Collman v. State*, this court determined that the defense's use of a forensic report during cross-examination of its preparer amounted to an introduction of part of the report for purposes of NRS 47.120(1). From this, the court concluded that the district court properly admitted the report in its entirety under the statute, because introduction of parts of the report required admissibility of other relevant parts.
>
> Regardless of whether the State's direct examination of Detective Hendrix concerning Smith's statements amounted to an introduction of these statements under NRS 47.120(1), we conclude the district court did not abuse its discretion in excluding the tapes and transcript of Smith's statements to Detective Hendrix. First, the district court permitted use of the transcript to refresh the detective's recollection of Smith's statements; therefore, Smith had the opportunity to utilize the transcript on cross-examination to remedy the instances in which Detective Hendrix lacked memory of particular statements. Second, the district court determined that several of Smith's responses on the tape were unintelligible.
>
> Despite Smith's contention that the tapes and their transcription constitute the "best evidence" of his statements, we are unable to ascertain the merits of this argument because neither party submitted the tapes or the transcript on appeal. Therefore, we conclude that it was not unreasonable for the

district court to exclude the tapes and the transcript due to the potential for confusing or misleading the jury under NRS 48.035(1).

(ECF No. 17-1 at 2–4 (internal footnotes omitted).)

Regarding Smith's contention that the exclusion of the tape recordings and transcripts violated his right to present a defense and right not be compelled to testify, the Nevada Supreme Court simply held these arguments lacked merit. (*Id.* at 8.) Smith's federal habeas petition only deals with the constitutional violations and not the evidentiary ruling under Nevada law. (*See* ECF No. 15 at 11.) Because Smith's constitutional violation arguments were denied on the merits without explanation by the Nevada Supreme Court, this Court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Harrington*, 562 U.S. at 102.

Respondents argue that Smith did not present the Nevada Supreme Court with the tape recordings or transcripts of his police interview, so this Court is prohibited from considering them in its review of this claim. (ECF No. 61 at 6.) Smith rebuts that because the Nevada Supreme Court failed to analyze his constitutional arguments, this Court's review is de novo, meaning that this Court can consider the tape recordings and transcripts. (ECF No. 68 at 28–29.) The Supreme Court has held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen*, 563 U.S. at 185. The Nevada Supreme Court failed to explain the reasoning behind its decision to deny the constitutional portion of Smith's claim; nonetheless, it still denied the claim on the merits. (*See* ECF No. 17-1 at 8.) Accordingly, this Court agrees with Respondents and will not consider the tape recordings or transcripts of Smith's police interview, as they were not a part of the record that the Nevada Supreme Court reviewed at the time it decided Smith's direct appeal.

Turning to the evidence presented at Smith's trial, Detective Todd Hendrix testified that he arrested Smith outside of Smith's home and took him to his unmarked police vehicle for an interview. (ECF No 16-20 at 24, 35–38.) Smith told Detective Hendrix that he had been driving a cab earlier in the day and that he had "picked up a man and a lady [who he presumed to be in a relationship] . . . and that at some point he dropped the man off, but the lady stayed in the car." (*Id.* at 38.) Smith indicated that the woman had been drinking and had "stated that she wanted to go back to the Luxor, but then stated that she didn't want to go to the Luxor" and instead "started asking questions about his house." (*Id.* at 38, 40.) Smith then decided to take the woman to his house. (*Id.* at 41.)

Upon arriving at Smith's house, Smith explained that the woman "got out of the cab and walked with him into his bedroom, that they subsequently laid down on the bed, that he bound her hands, that he took her clothes off and his clothes off, and had penis to vagina sex with her." (*Id.* at 43.) Smith also explained, at one point, that he bound her wrists to the bedpost and, at another point, that he bound her wrists "to a contraption on the ceiling." (*Id.* at 44.)

The state asked Detective Hendrix about inconsistencies in Smith's story. (*Id.* at 45). Detective Hendrix listed a few inconsistencies and then commented, "[i]t's been two years. I had a transcript of this that would refresh my recollection." (*Id.* at 45–46.) The state district court then commented, "[w]e'll use his memory at this point," and responded in the negative when asked by the state, "[y]ou don't want to refresh his recollection with the transcript, Judge?" (*Id.* at 46.)

Detective Hendrix then testified that Smith believed the woman wanted to have sexual intercourse with him because she smiled at him. (*Id.* at 46.) Smith, however, also explained that the woman "was in and out. Sometimes her eyes were closed, and sometimes they were open." (*Id.* at 47.) The state clarified, "[s]o he said at some point while he was having sex with her she was out of consciousness," and Detective Hendrix answered, "[d]uring the time she was on the bed, yes." (*Id.*) Smith also told Detective

8

Hendrix that "she was kind of in and out throughout his encounter with her," and at some point, he was not sure if she was really passed out. (*Id.* at 48.) After Detective Hendrix explained that a woman cannot legally consent to sexual intercourse "if she's in an inebriated state or whatever," Smith said that "he did not think she consented based on that definition." (*Id.* at 51.) Later, in a second interview, Smith told Detective Hendrix that "[h]e put [a] gas mask up to [the woman's] face for a short period of time" while she was passed out "before he started having sex with her." (*Id.* at 57.)

After the state finished its direct examination, the state district court excused the jury and asked Detective Hendrix about "a tape and transcript" of the interviews. (*Id.* at 60–61.) Detective Hendrix indicated that the tapes were two-and-a-half hours long and that he believed "the majority of it is relevant because there are certain things [Smith] says towards the beginning of the interview, and contradicts himself layer [sic] in the interview." (*Id.* at 62.) The state district court indicated that it was concerned about the tapes because "there's been some discussion before [the] trial here about possible inaccuracies in the transcript." (*Id.*)

The state district court indicated that it was going to listen to the tapes during the lunchbreak "to try to get a sense of just how clear these are" based on Detective Hendrix's previous testimony during direct examination that Smith "mumbled a lot, the sentences trail off, he was hard to understand, he was unintelligible." (*Id.* at 63, 66–67.) Smith's trial counsel requested that the tapes be played for the jury because "[t]he best evidence of Mr. Detective Hendrix's impression of what happened during the interview is on that tape." (*Id.* at 68.) The state district court responded that Smith's trial counsel could question Detective Hendrix's memory, "[a]nd, of course, [Smith] can give his rendition if he feels it's appropriate." (*Id.*)

Following a recess, both the state and Smith's trial counsel urged the state district court to play the tapes. (*Id.* at 69–70.) The state argued "that the entire taped statements are very relevant and should be played" and commented that it "had all along been ///

intending on playing the tapes in their entirety, and had conveyed that to the Defense."

(*Id.* at 70.) The state them commented:

> I think because it's the defendant's statement it's important to my case. I think the Defense believes it's important to their case because there are portions that are helpful to the Defense. This is obviously a consent defense. And there are two ways the defendant's position can be made known to the jury. One is through his statement to the police, and two is if he testifies himself. My concern is, the Court indicated earlier on the record to the Defense that the defendant can clear it up by getting on the stand and testifying. And I think that that almost forces the defendant to testify which he has a constitutional right not to do. He has a constitutional right to stay off the stand and to present his case through his statement to the police. And I think that the only realistic way at this point to present his statement to the police to the jury, is by playing those tapes. . . . I don't want to compound error or create error. I think it would not be error for that part of the tape to come in. I don't know that I would argue that but it's certainly an inference that the jury can infer. . . . My concern is that the state of the record right now, if the tapes do not come in it will be reversible error, and we'll be here in three years trying it again.

(*Id.* at 70–72.) The state district court then explained:

> I gave one of these tapes to my bailiff, and one to my secretary, and I took one. We played them on three different tape records. My secretary's view of it, first she said it sounded like a horse galloping on her tape. . . . My bailiff listened to his tape, and it was such that he could hear the officer pretty clearly, but he could not hear the response of the defendant on the tape. And that was what I found with my tape. The problem with that is, that it necessarily allows the jury to guess what the response is. And I suppose that either side can bolster their rendition of what they think the tape says, but to me it is just asking for trouble. And, [Smith's trial counsel], you've exclaimed [sic] your view of the law, which I don't disagree with what it talks about is bringing in the entire record, not just play excerpts and make the most of it, and not let the other side have the complete view of it. Certainly, we all recognize that. But my view of this is, that evidence must be of a quality which will assist or aid the jury in reaching a determination of the facts. And my listening of this is that it is subject to various interpretations. . . . If the quality of the tape is such that it's anyone's guess on occasion of what's being said, then we've got a problem. And as I indicated to [Smith's trial counsel], the transcript seems to be a problem. We've already mentioned one. I can understand why it's a problem. If I was trying to transcribe this thing, I would have a heck of a time. So you can reserve the issue for appeal. I'm going to disallow the tape and the transcript.

(*Id.* at 73–74.)

In response, Smith's trial counsel commented that Detective Hendrix's memory of the interview was cloudy due to the interview occurring approximately two years earlier and that the state district court's ruling "places Mr. Smith in a possible situation, as far as his Fifth Amendment rights, not to testify in this particular case." (*Id.* at 76–77.) The state district court commented, "[t]he problem is, the tape is not constructive use, in my view, so we will have to deal with what we have, which is a witness who is testifying based on his memory." (*Id.* at 77.) Rather, the state district court explained that Smith's trial counsel "can ask [Detective Hendrix] questions that would suggest a different response and [sic] that which was given to the tape." (*Id.* at 77.) The state district court, however, did allow the transcript to be used "to refresh memory in instances where it is genuinely a possibility and looks like we can do so." (*Id.* at 88.)

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (holding that the exclusion of critical corroborative evidence was unconstitutional because it interfered with the defendant's right to defend himself). Indeed, "[t]he Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense." *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (holding that the erroneous exclusion of the petitioner's journal and any reference to it, even petitioner's own testimony, "unconstitutionally interfered with her ability to defend against the charges against her" because "this highly probative evidence went to the crux of the case, and the harm caused by its exclusion was not cured by the receipt of other evidence that was significantly less compelling").

"[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A defendant's opportunity to be heard "would be an empty one if the State were permitted to exclude

competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.* This is because, "[i]n the absence of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690–91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)). That being said, the United States Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Id.* at 690.

To be sure, Smith's police interview statements were critical defense evidence because they were Smith's only opportunity—absent testifying at trial—to explain his version of the events that transpired. However, even if portions of Smith's police interview statement were exculpatory, as the state admitted, it cannot be concluded that Smith's constitutional rights were violated by the state district court's decision to disallow the tape recordings and transcripts of the interview to be admitted. The state district court determined that Nevada law prohibited the introduction of the tape recordings and transcripts because they were of poor quality, would not have assisted the jury, and were open to various interpretations. (ECF No. 16-20 at 73–74.) The Nevada Supreme Court, the final arbiter of Nevada law, agreed, finding that "it was not unreasonable for the district court to exclude the tapes and the transcript due to the potential for confusing or misleading the jury under NRS 48.035(1)." (ECF No. 17-1 at 4.) Accordingly, because the state district court determined that the evidence was unreliable, thereby constituting a valid state justification for disallowing the evidence, *id.* at 690–91, it cannot be concluded that Smith's right to present a complete defense, right to due process, and right to a fair trial were violated.

Moreover, importantly, Smith's trial counsel was able to cross-examine Detective Hendrix with Smith's exculpatory interview statements and to use the police interview transcript to refresh Detective Hendrix's recollection of any statements he may have

forgotten about. Indeed, during cross-examination, Smith's trial counsel indicated to Detective Hendrix that he had a copy of the transcript and he was "going through it as [questioning went] along." (ECF No. 16-20 at 95.) Thereafter, Smith's trial counsel asked Detective Hendrix numerous questions highlighting Smith's exculpatory interview statements: whether "Mr. Smith had told [him] that he had a conversation with Ms. Solorzano in the back of the cab;" whether Smith "told [him] that she had said 'yeah' to the question to come over to his house;" whether "Mr. Smith actually told [him] that Ms. Solorzano, at some point while Mr. Smith was putting on the straps or something, said something to the effect of: Ow, that hurts;" whether Smith told him "that she was responsive to his questions;" whether Smith told him that "he was sorry that such a mistake had been made" and that "he just wished the whole thing wouldn't have happened;" whether Smith had told him that Solorzano "seemed as if she was enjoying [the sexual encounter] when her eyes were closed;" whether Smith had told him that he and Solorzano sat on his bed talking and enjoying themselves before starting to have sexual intercourse; whether Smith had told him that Solorzano was sitting up when he placed her arms in the straps; whether Smith had told him that Solorazano walked from the cab into his bedroom; whether Smith had told him that Solorzano "was acting like normal"; whether Smith had told him that Solorzano was not passed out during the encounter; whether Smith had told him that "at some point towards the end of their encounter together, he had noticed a change in her attitude"; whether Smith had told him that he "thought she knew what she was doing;" whether Smith had told him in various ways on many occasions that he "thought it was mutual between the both of us;" and whether Smith had told him that "up until the point where Ms. Solorzano actually got out of the cab, he really didn't think there was anything wrong." (*Id.* at 95–112). Smith's trial counsel also confirmed, through Detective Hendrix's testimony, that Smith was not defiant during the interview and attempted to respond to all the questions asked. (*Id.* at 98.)

///

The foregoing cross-examination questions demonstrate that Smith's police interview statements were presented to the jury—albeit not in the fashion that Smith desired. Accordingly, Smith's argument that the exclusion of the recordings and transcripts violated his right not to testify, right to present a complete defense, right to due process, and right to a fair trial lacks merit. Smith was able to adequately present his consent defense to the jury through his trial counsel's cross-examination of Detective Hendrix thereby negating the need for Smith to testify in order to present his version of the events. Because the Court determines that fairminded jurists would agree that this reasoning establishing that Smith's federal constitutional rights were not violated was not inconsistent with prior decisions of the United States Supreme Court, *Harrington*, 562 U.S. at 102, Smith is not entitled to relief on Ground 1.

## B. Ground 2

In Ground 2, Smith asserts that his federal constitutional rights were violated when the state district court improperly allowed a witness to describe Solorzano as a "typical rape victim." (ECF No. 15 at 20.) In Smith's appeal of his judgment of conviction, the Nevada Supreme Court held:

Smith argues that the district court improperly permitted Leroy Dumag, an EMT and security officer with the Luxor Hotel, to characterize Solorzano as a "typical rape victim" he had encountered in the past. The State responds by asserting that Dumag was qualified to characterize Solorzano in this manner because of his experience as a police officer and deputy sheriff, and his handling of several sexual assault cases in the past.

"[A] district court has discretion to qualify a particular witness as an expert and to permit that witness to give opinion evidence." NRS 50.345 permits introduction of expert testimony to demonstrate that a victim's mental or physical condition is consistent with that of one who has suffered sexual assault. Further, NRS 50.265 permits a lay witness to testify only as to observations rationally based on the witness's perceptions and helpful to a clear understanding of the witness's testimony.

We conclude that the district court abused its discretion in permitting Dumag to refer to Solorzano as a "typical rape victim." NRS 50.345 permits no other type of testimony, other than that given by an expert, regarding the physical and mental condition of a sexual assault victim. The State never offered Dumag as an expert, or complied with the procedures necessary to qualify

14

Dumag as an expert. Regardless, we conclude that the error does not compel reversal, as explained below.

*Harmless error*

Despite the errors associated with prosecutorial delivery of improper statements during closing argument and admission of improper lay witness testimony, we conclude that these errors are harmless beyond a reasonable doubt.

First, Evidence [sic] at trial indicated that Solorzano was mentally unable to consent to sex per NRS 200.366(1). Both Solorzano and Patricia Caballero testified regarding Solorzano's extensive and prolonged drinking at dinner the night before the incident and ending shortly before Solorzano got into the cab with Smith. Also, Smith told police that Solorzano was in an out of consciousness in the cab and at his house, and that he could smell alcohol on her breath. Second, Luxor security personnel testified as to Solorzano's distraught behavior after Smith dropped her off at the hotel. Third, Solorzano testified with some particularity regarding the incident, which is sufficient in itself to uphold a conviction. Therefore, we also conclude that sufficient evidence supports the jury's verdict.

(ECF No. 17-1 at 5–7 (internal footnotes omitted).) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Leroy Dumag, an EMT and security officer at the Luxor Hotel and Casino, testified that he was previously employed as a police officer and deputy sheriff for an aggregate of nine years. (ECF No. 16-16 at 24–25.) During his time in those positions, Dumag worked on "several" rape cases. (*Id.* at 25.) Dumag explained that he received training through his law enforcement duties regarding rape victims. (*Id.* at 26.) Regarding the incident in question, Dumag testified that he "was called out to a case where it was a hysterical woman and they needed an EMT to try and see what the problem was." (*Id.*) After explaining that he approached Solorzano, the following discussion took place between the state and Dumag:

Q.   What did you do?
A.   I reached over, like I normally do, I put a gentle hand on her and said, 'How can I help you?' And she pulled away from me and she said, 'I've just been - - I can't remember her exact words, but she said in the sense of I was just assaulted. And the way she was crying, I just didn't want to touch her.

Q. Why did she not want you to touch her?

A. Because she reacted as a typical rape victim that I've handled in the past.

(*Id.* at 27–28.) Smith's trial counsel objected, but the state district court ruled that "[i]f that's his opinion based on his experience, I'll let him voice it. Go ahead." (*Id.* at 28.)

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *see also Lewis v. Jeffers*, 497 U.S. 764 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Therefore, the issue before this Court is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

Although Dumag's statement that Solorzano acted like a typical rape victim had no permissible inference, it cannot be concluded that this statement rendered Smith's trial fundamentally unfair in violation of his due process rights. *Estelle*, 502 U.S. at 67; *Sublett*, 63 F.3d at 930; *Jammal*, 926 F.2d at 920. As the Nevada Supreme Court reasonably noted, Dumag was never offered as an expert by the state, so his statement was improper. However, this single statement by an EMT and security officer in response to being asked why he did not touch Solorzano cannot be considered especially inflammatory. *See Hovey v. Ayers*, 458 F.3d 892, 923 (9th Cir. 2006) (explaining that "even if there are no permissible inferences the jury can draw from the evidence in question, due process is violated only if the evidence is 'of such quality as

necessarily prevents a fair trial'" and reasoning that "[w]e have held that admission of far more inflammatory evidence did not violate due process"). Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). And importantly, the Supreme Court "has not yet made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

Accordingly, the Nevada Supreme Court's decision denying Smith relief on this claim was reasonable. Smith is denied federal habeas relief for Ground 2.

### C.    Ground 3

In Ground 3, Smith asserts that his federal constitutional rights were violated when the state committed multiple instances of misconduct during closing argument. (ECF No. 15 at 22.) In Smith's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Smith takes issue with several of the prosecution's statements delivered in opening and closing arguments. Smith failed to object to these arguments; therefore, we will assess each in turn for plain error. In undertaking plain error review, we examine whether an "error" occurred, whether the error was "plain" or clear, and whether the error affected the defendant's substantial rights.
>
> *Motive to lie*
>
> The prosecution delivered the following statement in closing argument:
>
>> Who is the only person that you saw in this entire room who has got something to lose? Him, the defendant, the person charged with these crimes, the only person who has a reason to not be honest.
>
> We conclude that this type of argument is always improper. First, it is improper to characterize the defendant as a liar. Second, under this

17

argument, the State need only charge a person to motivate that person to be dishonest. However, this argument does not merit reversal, as it did not affect Smith's substantial rights, as explained in the harmless error analysis below.

*Disparaging defense counsel*

The prosecution also stated in closing argument the following:

> [Defense counsel] talked a little bit about the defendant being consistent in what he said to Detective Hendrix. Was he in the same courtroom we were?

We conclude that this argument was not improper. In any event, the argument does not warrant reversal of the convictions below.

*Implications in larger social problems*

Lastly, the prosecutor argued the following in its rebuttal closing argument:

> They want you to believe that we inflamed you by bringing in all these sex toys. You know what, you should be inflamed. This happened in our town. A cab driver took somebody who is a tourist in our town, and we survive based on tourists. We don't pay state income taxes because of tourists.
>
> The cab driver from our town took a tourist to our town and did this to her. You should be inflamed, and look at what he did to her. He took her into his bed while she was passed out and she was, basically, poured into the cab.

This commentary was inappropriate because it shifts the jury's focus away from whether Smith committed the crimes at issue, and toward implication of Smith in greater general social and economic issues, which are irrelevant and potentially prejudicial. Under the circumstances presented in this case, reversal is unwarranted, as explained below. Nonetheless, we caution the prosecution to refrain from such commentary in the future.
. . .
*Harmless error*

Despite the errors associated with prosecutorial delivery of improper statements during closing argument and admission of improper lay witness testimony, we conclude that these errors are harmless beyond a reasonable doubt.

First, Evidence [sic] at trial indicated that Solorzano was mentally unable to consent to sex per NRS 200.366(1). Both Solorzano and Patricia Caballero testified regarding Solorzano's extensive and prolonged drinking at dinner

18

the night before the incident and ending shortly before Solorzano got into the cab with Smith. Also, Smith told police that Solorzano was in an out of consciousness in the cab and at his house, and that he could smell alcohol on her breath. Second, Luxor security personnel testified as to Solorzano's distraught behavior after Smith dropped her off at the hotel. Third, Solorzano testified with some particularity regarding the incident, which is sufficient in itself to uphold a conviction. Therefore, we also conclude that sufficient evidence supports the jury's verdict.

(ECF No. 17-1 at 4–7 (internal footnotes omitted).) The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991) ("Improprieties in closing arguments can, themselves, violate due process."). A court must judge the remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

First, Smith takes issue with the following comment by the state during its surrebuttal argument:

They want you to believe that we inflamed you by bringing in all these sex toys. You know what, you should be inflamed. This happened in our town.

> A cab driver took somebody who is a tourist in our town, and we survive based on tourists. We don't pay state income taxes because of tourists.
>
> The cab driver from our town took a tourist to our town and did this to her. You should be inflamed, and look at what he did to her. He took her into his bed while she was passed out and she was, basically, poured into the cab.

(ECF No. 16-20 at 173.) Smith argues that this comment sought to inflame the jury, blame Smith for Nevada's tourism and tax issues, and called upon the jury to convict Smith to correct these issues. (ECF No. 15 at 23.) It appears that this comment was made in rebuttal to Smith's trial counsel's closing argument that "they've brought out all of these things, all of these different devices and lubrication . . . they've put on this side show in order to inflame you." (ECF No. 16-20 at 148.) Because this comment irrelevantly turned the focus of Smith's trial to social and economic issues in an attempt to appeal to the jurors' emotions, the Nevada Supreme Court reasonably concluded that the state's comment was inappropriate. *See United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury"); *United States v. Nobari*, 574 F.3d 1065, 1077 (9th Cir. 2009) (finding that "[t]he prosecution's comment was an improper appeal to jurors' emotions and fears"). However, the Nevada Supreme Court also reasonably concluded that this inappropriate comment did not warrant the granting of relief.

Detective Hendrix testified that Smith told him that Solorzano "was in and out," that "at some point while he was having sex with her she was out of consciousness," and that at some point, he was not sure if she was really passed out. (ECF No. 16-20 at 47–48.) Additionally, Solorzano testified that when she woke up, she felt that something had been inserted into her vagina, but she did not consent to sexual intercourse with Smith. (ECF No. 16-18 at 39–40.) Due to this substantial evidence of Smith's guilt, it cannot be concluded that the state's improper closing argument "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38. Moreover, the jury was instructed that "[s]tatements, arguments and opinions of

counsel are not evidence in this case." (ECF No. 16-21 at 14.) Therefore, it cannot be concluded that the state's outlying comment about tourism constituted a due process violation. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

Second, Smith takes issue with the following comment by the state during its surrebuttal argument: "Who is the only person that you saw in this entire courtroom who has got something to lose? Him, the defendant, the person charged with these crimes, the only person who has a reason to not be honest." (ECF No. 16-20 at 176.) The Nevada Supreme Court reasonably concluded that this comment was improper. *See United States v. Garcia-Guizar*, 160 F.3d 511, 520 (9th Cir. 1998) (agreeing that the prosecutor committed misconduct when the "prosecutor asserted a personal opinion regarding [the defendant's] credibility by calling him 'a liar'"); *see also United States v. Potter*, 616 F.2d 384, 392 (9th Cir. 1979) (recognizing that it was unprofessional for the prosecutor to have commented "that the defendant's testimony was 'inherently incredible'"). However, for the same reasons identified previously regarding the state's improper argument about tourism, the Nevada Supreme Court also reasonably concluded that this inappropriate comment did not warrant the granting of relief.

Third, Smith takes issue with the following comment by the state during its surrebuttal argument: "[Smith's trial counsel] talked a little bit about the defendant being consistent in what he said to Detective Hendrix. Was he in the same courtroom that we were?" (ECF No. 16-20 at 179.) Following this comment, the state elaborated: "Detective Hendrix sat here and said repeatedly that the defendant gave inconsistent statements, that he would go ask him a question at one point in the interview, and ask him the same or similar question later in the interview, and he kept getting different answers." (*Id.*) The Nevada Supreme Court reasonably concluded that the state's comment allegedly disparaging Smith's trial counsel was not improper. *See United States v. Sayetsitty*, 107

F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."); *see also United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel.").

Because the Nevada Supreme Court reasonably denied Smith relief on his prosecutorial misconduct claims, Smith is denied federal habeas relief for Ground 3.

### D. Ground 4

In Ground 4, Smith asserts that his federal constitutional rights were violated when the state committed misconduct by failing to test Solorzano's blood sample for methamphetamine after her urine sample came back positive for amphetamines. (ECF No. 15 at 24.) Smith elaborates that the state, having chosen not to conduct further testing that would have confirmed whether Solorzano had taken illegal drugs, could not later argue facts not in evidence by suggesting an innocent explanation for the positive urine test—and thereby profit from its lack of testing—when there was no evidence at trial supporting such an innocent explanation. (*Id.*)

In Smith's appeal of his judgment of conviction, the Nevada Supreme Court held that Smith's argument that there was "prosecutorial misconduct in failing to test Solorzano's blood for drugs" was without merit. (ECF No. 17-1 at 8.) Because Smith's claim was denied on the merits without explanation by the Nevada Supreme Court, this Court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Harrington*, 562 U.S. at 102.

Marian Adams, a sexual assault nurse examiner, testified that she performed a sexual assault exam on Solorzano on September 3, 2001, which entailed, in part, the obtainment of a blood and a urine sample. (ECF No. 16-17 at 47, 50.) Adams testified that Solorzano's blood alcohol level was .189 and her urine tested positive for amphetamines. (*Id.* at 56.) The following colloquy then occurred:

22

Q.    What does that mean? What kind of a test is this to determine there was a positive test for amphetamines?

A.    It's a prelim, and it tells us that if we want to - - there would be another further test if we wanted to go further with that.

Q.    What do you mean by prelim?

A.    There are different groups that can come positive for an amphetamine. Anything with ephedra could be positive for an amphetamine. Any kind of cough syrup, the power drinks that they now have ephedrine in it. Diet pills have ephedrine in it. Some basic food groups have ephedrine in it which could show positive for amphetamines.

Q.    So the positive test that we have here could be from some food, could be some diet pills? It could be from some drink, but it doesn't necessarily mean the actual methamphetamine?

A.    That's correct.

(*Id.* at 57.) Later, Smith's trial counsel cross-examined Adams about these tests:

Q.    . . . this urine screen that you did for the ephedra or for the amphetamines could test positive for amphetamines because a person is taking cold medication, as you testified to?

A.    Yes, sir.

Q.    Or it could be maybe some sort of allergy pill or something, correct?

A.    That's correct.

Q.    And in your report you indicate that there are other tests that can be done on the urine to determine whether or not, in fact, it is methamphetamine, correct?

A.    That's correct, sir.

Q.    Or some other controlled substance?

A.    That's correct, sir.

Q.    To your knowledge, none of those follow-up tests were done in this particular case, correct?

A.    That blood sample was taken to the crime lab, sir.

Q.    To your knowledge, do you know the results of those.

A.    I don't know. I have no idea, sir. Once I finish with my exam, I have no contact with the crime lab.

Q.    To the best of your knowledge here today, you don't know whether or not those tests were ever actually performed, correct?

A.    No, sir, I don't.

(*Id.* at 60–61.)

First, Smith's argument that his constitutional rights were violated when the state failed to submit Solorzano's blood for further testing lacks merit. "[T]he police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488

23

U.S. 51, 59 (1988) (explaining that the Due Process Clause is not violated when the police fail to use a particular investigatory tool); *see also Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (explaining that the state has "no constitutional duty to perform any particular test"). Second, Smith's argument that the state improperly suggested an innocent explanation for Solorzano's urine test, which showed a positive result for amphetamines, also lacks merit. Importantly, the state did not suggest that cough syrup, power drinks or diet pills could have been the cause of Solorzano's positive test—the nurse brought this up without prompting from the state. (*See* ECF No. 16-70 at 57.) The state then clarified that the positive test result for amphetamines "doesn't necessarily mean [Solorzano had taken] actual methamphetamine," (*id.*) thereby indicating that although there may have been an innocent explanation for the urine test result, there was also the possibility that the urine test result was due to illegal drug use. Accordingly, this questioning by the state does not amount to prosecutorial misconduct. *Darden*, 477 U.S. at 181. Because the Court determines that fairminded jurists would agree that this reasoning establishing that Smith's federal constitutional rights were not violated was not inconsistent with prior decisions of the United States Supreme Court, *Harrington*, 562 U.S. at 102, Smith is not entitled to relief on Ground 4.

### E.    Ground 6[2]

In Ground 6, Smith alleges that his federal constitutional rights were violated due to several instances of ineffective assistance of his trial counsel. (ECF No. 15 at 26.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply

[2]Ground 5 will be discussed with Ground 6(b).

a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

### 1. Ground 6(b) and Ground 5

In Ground 6(b), Smith asserts that his trial counsel failed to have him testify in his own defense once the state district court excluded his police interview tape recordings and transcripts, failed to consult with him regarding his right to testify, and failed to secure a waiver of his right to testify. (ECF No. 15 at 27.) This Court previously

determined that Smith failed to allege some of these arguments in his state-court post-conviction proceedings. (*See* ECF No. 50 at 6.) However, this Court determined that these additional arguments did not fundamentally alter the claim that the Nevada Supreme Court considered. (*Id.* (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (holding that "the supplemental evidence presented by respondent did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that respondent be remitted to state court for consideration of that evidence")).)

In Smith's appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claims that counsel was ineffective for commenting on appellant's right to remain silent during closing arguments. Appellant fails to demonstrate that counsel was deficient. Trial counsel stated during closing arguments, "[o]ne of the most important witnesses in this case didn't get on the stand and testify, but you heard what they had to say, and that is Keith in that interview." At the evidentiary hearing counsel testified that his choice to make this statement was a tactical decision. He wanted to use appellant's statements in the interview in order to tell appellant's side because appellant did not testify at trial. "Tactical decisions [of counsel] are virtually unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), and appellant failed to demonstrate any extraordinary circumstances. Therefore, the district court did not err in denying this claim.

(ECF No. 17-39 at 3.)

Similarly, in Ground 5, Smith asserts that his federal constitutional rights were violated when he was denied the right to testify in his own defense. (ECF No. 15 at 25.) Smith raised this issue in his original appeal of the denial of his state habeas petition. (*See* ECF No. 17-17 at 38–41.) However, the Nevada Supreme Court did not address it. (*See* ECF Nos. 17-20, 17-39.) "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. Thus, this court must

26

"determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Id.* at 102.

Following Detective Hendrix's testimony, outside the presence of the jury, the state district court informed Smith that he had "a right under the Constitution of the United States, and under the Constitution of the State of Nevada not to be compelled to testify," but Smith "may, if [he] wish[ed], give up this right and take the witness stand and testify." (ECF No. 16-20 at 129.) Smith indicated that he understood these rights. (*Id.* at 129–130.) The state district court then explained:

> There's a lot involved here as to whether or not you testify. There's some strategic reasons that you not testify, or testify, whatever, that I'm sure you're not aware of because it's very subtle. And it takes experienced attorneys to evaluate just all the nuances as to when it's good or not good to testify.
>
> It is your right. It is your decision to make. But what I tell people is, whatever your attorneys told you should be considered, because there's [a] lot to this that the average individual who is not involved in the practice of law wouldn't understand.

(*Id.* at 131.) Smith again indicated that he understood. (*Id.* at 132.)

The state district court then stated that "we're going to take a recess. When we reconvene, of course, we'll have to have an answer one way or the other." (*Id.*) During the recess, it appears that counsel convened in the state district court judge's chambers. (*Id.*) Following the recess, the state district court and counsel settled jury instructions. (*Id.* at 132–34.) During those discussions, the state district court asked Smith's trial counsel if he elected "not to have the *Carter* instruction read having to do with [Smith] not testifying," and Smith's trial counsel responded, "[t]hat's correct." (*Id.* at 134.) Thereafter, the jury was brought back into the courtroom, and both the state and the defense rested. (*Id.*)

///

Years later at Smith's post-conviction evidentiary hearing, Smith's trial counsel testified that "Mr. Smith decided not to testify in the case." (ECF No. 17-32 at 23.) Smith's trial counsel explained that he "presumed that the [police interview] tapes would be played so that the jury could hear Mr. Smith's explanation of what had happened," which would have been helpful to his defense because Smith made exculpatory statements in the police interview and "was fairly consistent . . . that this was a consensual encounter between himself and the alleged victim." (*Id.* at 8, 10–11.) However, if Smith had decided to testify after the state district court disallowed the tape recordings and transcripts of the police interview, he would have been subject to cross-examination by "[i]ncredibly experienced prosecutors." (*Id.* at 23.) Instead, Smith's trial counsel explained that he was "able to elicit all of Mr. Smith's self-exculpatory statements about consent" through his cross-examination of Detective Hendrix. (*Id.* at 34.) Additionally, Smith's trial counsel used his closing argument to essentially "testify for Mr. Smith" by "using his words from the transcript." (*Id.* at 23.)

First, Smith's contention that his trial counsel was deficient for failing to have him testify after the police interview tape recordings and transcripts were disallowed lacks merit. As this Court previously determined in Ground 1, Smith's trial counsel was able to cross-examine Detective Hendrix with Smith's exculpatory interview statements, thereby presenting Smith's police interview statements to the jury. Importantly, Smith's trial counsel confirmed that his cross-examination of Detective Hendrix was successful in eliciting all of Smith's exculpatory police interview statements. (ECF No. 17-32 at 34.) Accordingly, the need for Smith to testify was negated by the cross-examination of Detective Hendrix. Further, if Smith had testified, he would have been subject to harsh cross-examination. (*Id.* at 23.) Therefore, Smith fails to demonstrate that his trial counsel was deficient for not having him testify. *Strickland*, 466 U.S. at 688, 694 (1984).

Second, Smith's contention that his trial counsel was deficient for failing to consult with him about testifying also lacks merit. Importantly, there is no evidence that Smith's trial counsel failed to consult with him. Rather, Smith's trial counsel testified that "Mr.

Smith decided not to testify in the case." (ECF No. 17-32 at 23.) The fact that Smith made a decision about testifying and conveyed that decision to his trial counsel implies that there was at least some discussion between Smith and his trial counsel about testifying. Moreover, the state district court advised Smith to consider his trial counsel's advice about testifying, and Smith indicated that he understood. (ECF No. 16-20 at 131–32.) Thus, Smith fails to meet his burden of demonstrating that his trial counsel was deficient for not consulting him about testifying. *Strickland*, 466 U.S. at 688, 694 (1984).

Finally, Smith's contentions that he was denied the right to testify and that his trial counsel failed to secure a waiver of his right to testify lack merit. "[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). While a court cannot "presum[e] waiver of a fundamental right from inaction," *Barker v. Wingo*, 407 U.S. 514, 525 (1972), the rule in the Ninth Circuit is that a knowing and voluntary waiver of the right to testify is inferred when a defendant sits silently by when his attorney does not call him during the defense's case-in-chief:

> [W]hile waiver of the right to testify must be knowing and voluntary, it need not be explicit. [*United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).] A defendant is "presumed to assent to his attorney's tactical decision not to have him testify." *Id.* The district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right. *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir. 1990); *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991). "[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Joelson*, 7 F.3d at 177. A defendant who wants to reject his attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or discharging his lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not to call him as a witness," he waives the right to testify. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993).

*United States v. Pino-Noriega*, 189 F.3d 1089, 1094–95 (9th Cir. 1999).

Here, Smith sat silently by during trial and made no claim on the record that he allegedly wished to testify. (ECF No. 16-20 at 129–34.) Due to his silence, Smith waived

his right to testify. *Id.* at 1094–95; *Nohara*, 3 F.3d at 1244. Accordingly, Smith's claims that his trial counsel was deficient for failing to secure his waiver of the right to testify, *Strickland*, 466 U.S. at 688, and that he was the denied the right to testify fail.

In sum, regarding Ground 6(b), the Nevada Supreme Court reasonably denied Smith relief on his *Strickland* claim. And, regarding Ground 5, the Court determines that fairminded jurists would agree that the foregoing reasoning establishing that Smith's right to testify was not violated was not inconsistent with prior decisions of the United States Supreme Court. *Harrington*, 562 U.S. at 102. Therefore, Smith is denied federal habeas relief for Grounds 6(b) and 5.

## 2. Ground 6(c)

In Ground 6(c), Smith asserts that his trial counsel failed to seek testing of Solorzano's blood sample. (ECF No. 15 at 30.) Smith explains that proof that Solorzano used methamphetamine could have been used to impeach her and show that the effects of her alcohol consumption were counteracted by methamphetamine, a stimulant. (*Id.*) In Smith's appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to test the victim's blood sample to see if it was positive for methamphetamine. Appellant fails to demonstrate that trial counsel was deficient or that he was prejudiced. [Footnote 3: Further, to the extent that appellant claims that the district court erred by denying his motion for discovery regarding the testing of the blood sample, appellant fails to demonstrate that the district court abused its discretion in denying the motion. *Id.*] Trial counsel testified at the evidentiary hearing that he did not pursue the blood sample because the theory of the prosecution was that the victim was too intoxicated to consent, and if the victim was also on methamphetamine in addition to drinking, that would only help the State. "Tactical decisions [of counsel] are virtually unchallengeable absent extraordinary circumstances," *Ford*, 105 Nev. at 853, 784 P.2d at 953, and appellant failed to demonstrate any extraordinary circumstances. Further, appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel further tested the blood sample. Appellant claims that because methamphetamine is a stimulant it may have shown that the victim was aware of what she was doing and that she consented to the sexual contact. As stated above, appellant's own statements to the police demonstrate that the victim was in and out of consciousness during the entire incident, which does not change even if

counsel demonstrated that she was using methamphetamine. Therefore, the district court did not err in denying this claim.

(ECF No. 17-39 at 5–6.) The Nevada Supreme Court's rejection of Smith's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Smith's trial counsel testified at the post-conviction evidentiary hearing that nothing was "done to confirm whether, in fact, [Solorzano] was under the influence of methamphetamine." (ECF No. 17-32 at 14, 17.) Smith's trial counsel then explained why he did not have Solorzano's blood sample tested:

> [T]he State's theory was a little bit different than in many of the cases[,] where as their primary complaining witness, the alleged victim in this case, her testimony was that she couldn't remember what had occurred in the sense that she couldn't recall having sexual intercourse with Mr. Smith. I think she came to realize or believe that she had based on how she felt and other things, but she didn't have a specific visual memory of having a sexual encounter with Mr. Smith, consensual or non-consensual.
>
> And so the issue of intoxication was central to the State's case in the sense that the State, for lack of a better term, needed her as drunk as possible, as intoxicated as possible in order to support their claim that no reasonable person, Mr. Smith, or no reasonable jury could come to the conclusion that this woman would be in any condition to consent based on her intoxication, that any reasonable person would know that this person was obviously intoxicated. So what that did was and it was just like a Gordian knot from the defense perspective, is you're kind of damned if you do and you're damned if you don't. The more drunk she was, the more I supported the State's argument that this woman could not have told or could not have - - well, could not have consented. And then when you add in the additional issue of whatever substance it was, the amphetamines, methamphetamine, whatever it was, it places you in another uniquely exquisite position of making her more intoxicated.
>
> . . . [N]o one knows what the ramifications of . . . that intoxication would be. But it also fell into the trap, and at least in my estimate, that it supported the State's theory that this person was obviously so intoxicated that any reasonable person, i.e., the defendant, would have known that this person couldn't consent under any circumstances.
>
> And so I made the decision that . . . there was amphetamines there, the jury could make what it wanted of it, but it was a very difficult tightrope to walk from a defense perspective because the State's theory was intoxication and

31

inability to be able to consent. And normally as a defense - - as a defense attorney in a case, if I can prove that a witness is on drugs, that's a good thing from a credibility standpoint. But this case, in the unique contours of it, it was completely opposite of that for many reasons. So I didn't have the substance tested.

(*Id.* at 31–32.)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. And "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense," *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994), and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). "[I]neffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

Smith's trial counsel testified that he did not test Solorzano's blood sample for methamphetamine because proving that she was under the influence of methamphetamine—not just alcohol—would not have aided Smith's consent defense. (*See* ECF No. 31-32.) Although a positive result for methamphetamine may have impeached Solorzano's testimony, it would not have seriously undermined the state's case, especially considering some of Smith's statements to Detective Hendrix regarding Solorzano's lack of consciousness. Rather, as Smith's trial counsel reasonably testified, a positive result for methamphetamine could have strengthened the state's position that Solorzano was too intoxicated to consent. Accordingly, Smith's trial counsel's decision not to investigate Solorzano's blood sample was reasonable. *Strickland*, 466 U.S. at 691. Because the Nevada Supreme Court reasonably concluded that, based on his

///

post-conviction evidentiary hearing testimony, Smith's trial counsel was not deficient, *id.* at 688, Smith is denied federal habeas relief for Ground 6(c).

### 3. Ground 6(d)

In Ground 6(d), Smith asserts that his trial counsel failed to investigate or move for the discovery of Solorzano's criminal history. (ECF No. 15 at 30–31.) In Smith's appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to request the criminal history of the victim from the State. Appellant fails to demonstrate that counsel was deficient or that he was prejudiced. [Footnote 2: Further, to the extent that appellant claims that the district court erred by denying his motion for discovery regarding the victim's criminal history, appellant fails to demonstrate that the district court abused its discretion in denying the motion. *Means*, 120 Nev. at 1007, 103 P.3d at 29.] Trial counsel testified at the evidentiary hearing that his office had access to computer programs that could produce a person's criminal history. He stated that he asked his investigator to look into the victim's criminal history and that the investigator did not inform him of any criminal history. Further, appellant fails to demonstrate a reasonable probability of a different outcome at trial had counsel requested the criminal history from the State given the overwhelming evidence presented at trial, including appellant's statements to the police that the victim was in and out of consciousness. Therefore, the district court did not err in denying this claim.

(ECF No. 17-39 at 4–5.) The Nevada Supreme Court's rejection of Smith's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Smith's trial counsel testified at the post-conviction evidentiary hearing that he believed he "instructed [his investigator] to make inquiries as to whether or not there was any kind of criminal history that [Solorzano] might have in upstate New York." (ECF No. 1-32 at 18.) Smith's trial counsel explained that he "never received a report back from [his] investigator that she had any criminal history" and that when he fails to get a response back from investigator on an issue or question he has posed, he presumes that there was nothing found. (*Id.* at 18, 30.) Smith's trial counsel also explained that "the State never provided to [him], . . . under *Brady*, any convictions or other arrest that would be exculpatory in nature." (*Id.* at 18.) Thus, Smith's trial counsel "never, ever came

33

to the conclusion that . . . there was criminal history . . . alleged in the victim's background." (*Id.* at 30.)

Because Smith's trial counsel testified that he asked his investigator to research Solorzano's criminal history and got no information in response, Smith's trial counsel fulfilled his "duty to make reasonable investigations." *Id.* at 691. Therefore, because the Nevada Supreme Court reasonably concluded that, based on his post-conviction evidentiary hearing testimony, Smith's trial counsel was not deficient, *id.* at 688, Smith is denied federal habeas relief for Ground 6(d).

### 4. Ground 6(e)

In Ground 6(e), Smith asserts that his trial counsel failed to make contemporaneous objections to two of the state's closing comments because if he had done so, the Nevada Supreme Court would have reviewed these issues on appeal under a more favorable standard of review.[3] (ECF No. 15 at 31.) Specifically, as is further explained in Ground 3, Smith's trial counsel failed to object to the state's closing argument commenting that Smith had a motive to lie and urging the jury to convict Smith in order to solve larger social problems. (*Id.*)

Smith raised this issue in his original appeal of the denial of his state habeas petition. (*See* ECF No. 17-17 at 31–33.) However, the Nevada Supreme Court did not address it. (*See* ECF Nos. 17-20, 17–39.)

If a defendant objected to a potential error at trial, the appellate court reviews for harmless error: "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." NRS § 178.598. And if a defendant failed to object to a potential error at trial, the appellate court reviews for plain error: "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." NRS § 178.602. In the case of plain-error review, "the burden is on the defendant to show actual prejudice or a miscarriage of justice." *See Green v.*

---

[3]This Court previously determined that a third comment by the state, which disparaged Smith's trial counsel, was unexhausted. (ECF No. 50 at 6.) That portion of Ground 6(e) was later dismissed. (ECF No. 53 at 1.)

*State*, 80 P.3d 93, 95 (2003). Accordingly, if an error is identified by the appellate court, the only difference between harmless-error review and plain-error review in determining whether relief should be granted is the burden of proof: a forfeited error requires the defendant, rather than the government, to "bear[ ] the burden of persuasion with respect to prejudice." *United States v. Olano*, 507 U.S. 725, 734 (1993); *see also Green*, 80 P.3d at 95 n.7 (explaining that "Fed. R. Crim. P. 52(b) . . . is identical to NRS 178.602").

The Nevada Supreme Court determined that the state's arguments that Smith had a motive to lie and that the jury should convict Smith in order to solve larger social problems amounted to plain error. (ECF No. 17-1 at 4–5.) However, the Nevada Supreme Court determined that relief was not warranted because there was "sufficient evidence [to] support[ ] the jury's verdict." (*Id.* at 7.) Because the Nevada Supreme Court determined that there was sufficient evidence to support the jury's verdict, Smith fails to demonstrate that there is a reasonable probability that, had his trial counsel objected to the state's arguments and procured harmless-error review rather than plain-error review, thereby shifting the burden of proof regarding prejudice, the result of his appeal would have been different. *Strickland*, 466 U.S. at 694. Accordingly, the Court determines that fairminded jurists would agree that the foregoing reasoning establishing that Smith's constitutional rights were not violated was not inconsistent with prior decisions of the United States Supreme Court. *Harrington*, 562 U.S. at 102. Therefore, Smith is denied federal habeas relief for Ground 6(e).

### 5. Ground 6(f)

In Ground 6(f), Smith asserts that his trial counsel failed to object to the introduction of prejudicial evidence, including the "plethora of sexual paraphernalia recovered at Smith's home." (ECF No. 15 at 31.) Smith argues that this evidence had no relevance to the issues at trial. (*Id.* at 32.) In Smith's appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant claims that trial counsel was ineffective for failing to object to other bad act evidence that was introduced at trial. Specifically, appellant

35

claims that counsel should have objected to the State's introduction of other "sex toys" and apparatuses found in appellant's home that were not used in the crime. We note that owning sex toys and apparatuses would not be a bad act pursuant to NRS 48.045(2) as owning these objects is not illegal. However, appellant also argues that the evidence was irrelevant and that the probative value of the evidence was substantially outweighed by the prejudicial effect of the evidence. Appellant fails to demonstrate that he was prejudiced by trial counsel's failure to argue that the evidence was irrelevant. Specifically, appellant fails to demonstrate a reasonable probability of a different outcome at trial because there was overwhelming evidence presented at trial. The evidence presented demonstrated that the victim was unable to consent to sexual contact because the victim had been heavily drinking prior to getting into appellant's cab. Appellant told the police in his interview that the victim was in and out of consciousness during the cab ride and at his home. Further, this court concluded on appeal that the victim testified with some particularity regarding the incident, which was sufficient in itself to uphold the conviction. *Smith v. State*, Docket No. 42069 (Order of Affirmance and Limited Remand to Correct the Judgment of Conviction, December 21, 2005). Therefore, the district court did not err in denying this claim.

(ECF No. 17-39 at 3–4.) The Nevada Supreme Court's rejection of Smith's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Detective Dolphis Boucher testified that he assisted in the search of Smith's residence following Smith's arrest. (ECF No. 16-18 at 136, 143.) Detective Boucher testified that the following items were located during that search: a sex swing, a blind fold, petroleum jelly, lubricants, an anal stimulator, a French tickler, and a rubber piece of hose. (*Id.* at 150, 158.) Later, during Smith's trial counsel's closing argument, he commented that "they've brought out all of these things, all of these different devices and lubrication . . . they've put on this side show in order to inflame you." (ECF No. 16-20 at 148.)

Smith's trial counsel testified at the post-conviction evidentiary hearing that he would not have opposed a hypothetical motion by the state to introduce the sexual toys because "in this particular case [he did not] necessarily think it would have been a bad act." (ECF No. 17-32 at 20.) Smith trial counsel explained that "Smith always alleged that this was a consensual encounter, . . . [so] the presence of sex toys one way or the

36

other wasn't going to effect the defense." (*Id.* at 28–29.) Further, Smith's trial counsel explained that he did not believe these items would have been excluded because sexual toys "are not inherently bad" and "the sex toys themselves would have been proof that there was an intention to have sex or that there was sex," which is one thing that the state has to prove in a sexual assault case. (*Id.* at 29.)

Although moving to exclude the sexual toys may not have aided in Smith's consent defense, Smith's trial counsel may have still been deficient for not attempting to exclude these salacious items, especially in light of his closing argument that the items were presented only to "inflame" the jury and in light of the fact that Smith admitted to the sexual act, thereby negating the need for the state to use the sexual toys to establish that a sexual act occurred. However, the Nevada Supreme Court reasonably concluded that Smith failed to demonstrate prejudice because there was overwhelming evidence of Smith's guilt presented at trial. Indeed, Detective Hendrix testified that Smith told him that Solorzano "was in and out," that "at some point while he was having sex with her she was out of consciousness," and that at some point, he was not sure if she was really passed out. (ECF No. 16-20 at 47–48.) Additionally, Solorzano testified that when she woke up, she felt that something had been inserted into her vagina, but she did not consent to sexual intercourse with Smith. (ECF No. 16-18 at 39–40.) Based on this evidence, Smith fails to demonstrate that "there is a reasonable probability that, but for counsel's [potential failure to exclude the sexual toys], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, because the Nevada Supreme Court reasonably denied Smith's ineffective-assistance-of-counsel claim, Smith is denied federal habeas relief for Ground 6(f).

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Smith. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281

F.3d 851, 864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the Court finds that a certificate of appealability is unwarranted.

## VI.   CONCLUSION

It is therefore ordered that the Amended Petition for Writ of Habeas Corpus (ECF No. 15) is denied.

It is further ordered that Petitioner is denied a certificate of appealability.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 31st day of March 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE